**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DILIGENT PAYMENTS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 24-cv-05125 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| CARPAY, INC. et al., | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Diligent Payments, LLC ("Diligent") markets credit and debit card processing services. Diligent and Defendant Carpay, Inc. ("Carpay"), a software company, entered into an Independent Contractor Agreement ("ICA") to promote payment processing services to Carpay's car dealership customers. Diligent has now sued Carpay, alleging that it breached the notice and non-solicitation and non-circumvention provisions of the ICA when it replaced Diligent with a third-party competitor, iSolutions Payments LLC ("iSolutions"). Before the Court is Carpay's motion to dismiss Diligent's claims pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 20.) For the following reasons, the motion is granted in part and denied in part.

## BACKGROUND

For purposes of Carpay's motion to dismiss, the Court accepts as true all well-pleaded facts in the Complaint and views those facts in the light most favorable to Diligent as the nonmoving party. *See Santiago v. Walls*, 599 F.3d 749, 756 (7th Cir. 2010). The Complaint alleges as follows.

## I.  Diligent and Carpay's Contract

Diligent promotes credit and debit card processing services and other merchant services to Buy Here Pay Here ("BHPH") car dealerships for the sale of used cars and related services. (Ex. A. to Notice of Removal at 2–19 ("Compl."), Compl. ¶ 10, Dkt. No. 1-1.) BHPH refers to a model of "on-lot financing" whereby car dealerships lend qualifying customers the money to buy a car right off the lot. (*Id.* ¶ 11.) The specialized lending activities of BHPH car dealers require both credit card processing and a niche merchant product offering for loan management services. (*Id.* ¶¶ 14–15.)

In the payments industry, Diligent is registered as an independent sales organization ("ISO"), maintaining a relationship with the credit card association (*e.g.*, VISA and MasterCard) through sponsorship by a processing bank member. (*Id.* ¶¶ 13–14, 16.) Diligent's payment processing filters through an upstream payment processing vendor, CardConnect LLC ("CardConnect"). (*Id.* ¶ 16.) As one of CardConnect's largest sales networks, Diligent receives favorable price structuring and other contractual benefits for onboarding new BHPH dealer merchant accounts on CardConnect's platform. (*Id.* ¶ 19.)

In 2018, Carpay approached Diligent to explore a partnership. (*Id.* ¶ 22.) At the time, Carpay was developing an online loan management tool for BHPH dealers. (*Id.* ¶ 23.) Because Carpay was not a registered ISO, however, it needed an upstream payment processing partner to lawfully acquire merchants or engage in other payment processing activities. (*Id.* ¶¶ 20–21.) Carpay knew that Diligent had a relationship with CardConnect and an effective sales team. (*Id.* ¶ 23.) Thus, Carpay sought appointment as an authorized sales agent for Diligent's payment processing and merchant services. (*Id.* ¶¶ 22–23.) Diligent agreed and appointed Carpay as an authorized sales agent beginning in 2018. (*Id.* ¶ 25.) The parties further agreed to split the

2

residuals[1] and other revenue generated from Carpay's successful acquisition of BHPH merchant accounts, with Carpay receiving 80% and the remaining 20% going to Diligent. (*Id.*)

By 2019, however, Carpay was struggling to generate sales. (*Id.* ¶ 26.) On July 23, 2019, Diligent and Carpay entered into the ICA, which formalized and modified their prior agreement to give Diligent a greater share of the revenue split in exchange for Diligent assuming control over all sales activities on Carpay's behalf. (*Id.* ¶¶ 27–29.) The revised revenue share was 50/50. (*Id.* ¶ 28.) Diligent established a sales team dedicated exclusively to selling and marketing Carpay's software. (*Id.* ¶ 30.) Within a year, Diligent increased Carpay's software sales by approximately 1400%. (*Id.* ¶ 42.)

In 2020, Diligent and Carpay discussed Carpay's desire to acquire Diligent, but those discussions stalled. (*Id.* ¶¶ 46–48.) Instead, the parties informally agreed to an "alternative merger-like agreement" whereby Diligent would be Carpay's exclusive payment processor, provided two of Diligent's co-founders would go work for Carpay. (*Id.* ¶¶ 49–50.)

## II.     Alleged Breaches of the ICA by Carpay

Diligent alleges that the ICA prohibited Carpay or any of its affiliates, for a specified period of time, from directly or indirectly engaging in, or permitting a third party to engage in, the following conduct: (i) soliciting Diligent's merchants and customers, or (ii) negotiating, contracting, or soliciting CardConnect for any business arrangement that would allow Carpay to provide services substantially similar to or in direct competition with Diligent. (*Id.* ¶ 34.) Additionally, Diligent contends that the ICA required Carpay to provide Diligent with at least 90

---

[1] Residuals, in this context, refer to revenue earned from successfully boarded merchant accounts, via monthly transactional sales volume. (Compl. ¶ 14.)

days' prior notice if Carpay intended to replace Diligent or develop relationships with one of its competitors. (*Id.* ¶ 54.)

During negotiations to amend the ICA, Diligent discovered that Carpay had contacted CardConnect—an act Diligent claims violated the notice and non-solicitation and non-circumvention provisions of the ICA. (*Id.* ¶¶ 53–54.) Nonetheless, the parties agreed to modify the existing fee structure for residuals and other revenue under the ICA. (*Id.* ¶ 55.) Accordingly, on November 12, 2020, the parties signed an amended agreement ("Amended ICA"). (*Id.* ¶ 56.)

In April 2021, while Diligent was finalizing a deal for a private equity firm to acquire its business, Carpay's Chief Executive Officer ("CEO") informed one of Diligent's co-founders that Carpay planned to violate the ICA's non-solicitation provision. (*Id.* ¶¶ 60, 64–65.) Then, on May 7, 2021, Carpay sent Diligent formal notice announcing that: (1) Carpay planned to replace Diligent as an ISO with a third-party competitor, pursuant to the ICA's 90-day notice requirement; (2) Carpay was revoking Diligent's license to resell its product, pursuant to the Amended ICA's 60-day notice requirement; and (3) Carpay planned to resume direct sales of its software to users of the Wayne Reaves and AutoManager Dealer platforms, pursuant to the Amended ICA's 30-day notice requirement. (*See id.* ¶¶ 67–68.) That same day, Carpay terminated Diligent's access to Carpay's email system, which prevented Diligent from performing its work during the transition period, in violation of the ICA's notice provision. (*Id.* ¶¶ 69–71.)

Despite those alleged breaches, beginning in August 2021 and continuing through the fall of 2021, Diligent and Carpay resumed negotiations regarding Carpay's potential acquisition of Diligent. (*Id.* ¶¶ 74–75.) Carpay instructed Diligent to begin drafting deal documents for the proposed acquisition. (*Id.* ¶ 76.) However, while Diligent was preparing the paperwork, Carpay notified Diligent that it would not be moving forward with negotiations and that it had instead

signed on with another ISO. (*Id.* ¶ 78.) Eventually, Diligent learned that Carpay had replaced it

with iSolutions. (*Id.* ¶ 79.) iSolutions processes payments using CardConnect—*i.e.*, the same

upstream vendor that Diligent uses—which Diligent claims violates the non-solicitation and non-

circumvention provisions of the Amended ICA. (*Id.* ¶ 80.) Diligent later discovered that

iSolutions has a history of targeting sales agents with existing merchant portfolios on

CardConnect's platform and assuming control of those portfolios, thus moving those portfolios

beyond the control of the original ISOs. (*Id.* ¶ 81.)

Diligent has now sued Carpay. In its Complaint, Diligent asserts the following state law

claims: breach of contract (Count I), unjust enrichment (Count II), specific performance (Count

III), and declaratory relief (Count IV).

## DISCUSSION

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This

pleading standard does not necessarily require a complaint to contain detailed factual

allegations. *Twombly*, 550 U.S. at 555. Rather, "[a] claim has facial plausibility when the plaintiff

pleads factual content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged." *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir.

2014) (quoting *Iqbal*, 556 U.S. at 678). Although the Court accepts the plaintiff's well-pleaded

factual allegations as true, conclusory allegations are not sufficient to stave off dismissal. *Iqbal*,

556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice."). Furthermore, under Federal Rule of Civil Procedure

10(c), contracts attached to a complaint are considered a part of the pleading and may be

considered in connection with a motion to dismiss. *Chi. Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.*, 474 F.3d 463, 465–66 (7th Cir. 2007).

## I. Breach of Contract (Count I)

To state a claim for breach of contract under Illinois law, a plaintiff must allege "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) breach of contract by the defendant; and (4) resultant injury to the plaintiff." *Avila v. CitiMortgage, Inc.*, 801 F.3d 777, 786 (7th Cir. 2015) (citation omitted). Carpay argues that Diligent's claim for breach of contract should be dismissed because Diligent has failed to plausibly allege the third element: that Carpay breached the ICA. Specifically, Carpay contends that the ICA authorized it to replace Diligent with any third-party competitor, that Carpay's conduct did not contravene any express term of the ICA, and that Diligent relies on restrictive covenants that constitute unenforceable restraints on trade.

The main goal of contract interpretation is to implement the parties' intent, which is ascertained by examining the contractual language and construing the contract as a whole with each provision viewed in light of the other provisions. *Thompson v. Gordon*, 948 N.E.2d 39, 47 (Ill. 2011). A court may determine the meaning of a contract as a matter of law, if it concludes that the contract is unambiguous. *INEOS Polymers Inc. v. BASF Catalysts*, 553 F.3d 491, 498 (7th Cir. 2009). And a contract is ambiguous only when it is capable of "more than one reasonable interpretation." *Am. Bankers Ins. Co. of Fla. v. Shockley*, 3 F.4th 322, 328 (7th Cir. 2021) (citation and internal quotation marks omitted). To the extent the allegations in the complaint are contradicted by the contract itself, "the contract[] trump[s] the facts or allegations presented in the [c]omplaint." *Chi. Dist. Council of Carpenters Welfare Fund*, 474 F.3d at 466. Further, "[w]here

a written agreement is clear and explicit, a court must enforce the agreement as written." *Cannon v. Burge*, 752 F.3d 1079, 1088 (7th Cir. 2014) (citations and internal quotation marks omitted).

### A.    Carpay's Contact with CardConnect

Diligent alleges that Carpay breached the ICA's notice and non-solicitation and non-circumvention provisions by contacting CardConnect during negotiations to amend the ICA. As relevant here, Section 4.1 of the ICA—the non-solicitation and non-circumvention provision—provides:

> [Carpay] agrees that, (a) during the Term hereof, (b) so long as [Carpay] is receiving Residuals hereunder, and (c) for a period of two (2) years following the expiration of (a) or (b), neither [Carpay] nor any of its affiliates will directly or indirectly engage in the following conduct, or permit or assist any third party to engage in the following conduct, in any capacity including as an employee, employer, consultant, agent, principal, partner, stockholder, corporate officer, director, or in any other individual or representative capacity ("Non-solicitation Obligations"):

> (a) Merchants. call on, solicit, take away, or attempt to call on, solicit, or take away any of the merchants, customers or Merchants of [Diligent] whether boarded by the Agent or not, except in the course of good faith performance under [the ICA]; . . .

> (c) Vendor. enter into negotiation, contract or otherwise solicit Card Connect with whom [Diligent] has an ongoing relationship with. [sic] For the purpose of entering into any direct business arrangement or contract between [Carpay] and Card Connect where performance of the solicited/negotiated/proposed business arrangement or contract would permit [Carpay] to provide services that are substantially similar to or in the direct competition with [Diligent], whether or not Card Connect continues of [sic] discontinues its business relationship with [Diligent].

(Ex. A to Notice of Removal at 22–36 ("ICA"), ICA § 4.1, Dkt. No. 1-1.) Additionally, Section 1.3 of the ICA requires Carpay to provide Diligent with 90 days' written notice prior to "any corroboration with third-party competitors to [Diligent], any intent [Carpay] may have to replace [Diligent] and develop and corroborate with [sic] any relationships between [Carpay], or any of its affiliates, and any third party competitors of [Diligent]." (ICA § 1.3.)

Even accepted as true with all reasonable inferences drawn in Diligent's favor, the allegations in the Complaint fall short of plausibly alleging that Carpay breached these provisions of the ICA when it contacted CardConnect. To begin, Diligent does not allege that Carpay's contact was "[f]or the purpose of entering into any direct business arrangement or contract" between Carpay and CardConnect—a requirement for any breach of Section 4.1(c) of the ICA. (ICA § 4.1(c).) Instead, Diligent alleges only that Carpay "violated the non-solicitation/non-circumvention provision at Section 4 of the [ICA] by contacting a key vendor of [Diligent]—namely, CardConnect." (Compl. ¶ 53.) Without any allegation that Carpay contacted CardConnect for a prohibited purpose, Diligent's allegations that Carpay breached Section 4.1(c) the ICA are insufficient.

Moreover, Diligent has not plausibly alleged that Carpay violated the notice provision when it contacted CardConnect. As allege in the Complaint:

> This contact was also a breach of Section 1.3 of the [ICA], which, even assuming the potential replacement processing partner was not otherwise protected from solicitation/circumvention under Section 4 (although, in this instance, CardConnect is a protected relationship), requires that Carpay give Plaintiff at least ' . . . ninety (90) days prior written notice to any corroboration with third-party competitors to [Diligent], any intent [Carpay] may have to replace [Diligent] and develop and corroborate with any relationships between [Carpay], or any of its affiliates, and any third party competitors of [Diligent].' No advance ninety-day [notice] had ever been provided.

(*Id.* ¶ 54.) However, Diligent fails to allege facts plausibly supporting its claim that Carpay's contact with CardConnect constituted Carpay corroborating with third-party competitors or demonstrated Carpay's intent to replace Diligent with a third-party competitor—a necessary condition to trigger the 90-day notice requirement.

### B.      Carpay's Replacement of Diligent with iSolutions

Diligent next claims that Carpay breached the ICA's non-solicitation and non-circumvention provision when it replaced Diligent with iSolutions as its payment processing partner. In particular, Diligent contends that the ICA precluded Carpay from replacing Diligent with a third-party competitor that used the same upstream vendor as Diligent—*i.e.*, CardConnect. In response, Carpay disputes that the ICA contains any such restriction. It argues that (1) the ICA expressly authorized Carpay to replace Diligent; (2) the ICA has no restrictions regarding with which third-party competitors Carpay may replace Diligent; and (3) the ICA only prohibits Carpay from soliciting Diligent's merchants or customers and soliciting CardConnect for the purpose of entering into a direct business arrangement or contract between CardConnect and Carpay.

As an initial matter, Carpay is incorrect in asserting that the ICA expressly permitted it to replace Diligent with any of Diligent's competitors. To support its claim, Carpay selectively quotes language from Section 1.3 of the agreement, pointing to phrases such as "replace [Diligent]" and "any third party competitors." While those phrases are indeed found in Section 1.3, that provision does not provide the express authorization Carplay claims. Rather, Section 1.3 is a notice provision, titled "Disclosure of Additional Relationships," that requires Carpay to "disclose, with ninety (90) days prior written notice to any corroboration with third-party competitors to [Diligent], any intent [Carpay] may have to replace [Diligent] and develop and corroborate with any relationships between [Carpay], or any of its affiliates, and any third party competitors of [Diligent]." (ICA § 1.3.) In short, this provision does not expressly state that Carpay may replace Diligent with any third-party competitor.

Moving to Section 4.1(c), the ICA prohibits Carpay or its affiliates from directly or indirectly soliciting CardConnect, or permitting a third party to solicit CardConnect, for the purpose of entering into any direct business arrangement or contract pursuant to which Carpay would be allowed to provide substantially similar services as Diligent or services in direct competition with Diligent. (ICA § 4.1(c).) In addition, Section 4.1(a) prohibits Carpay or its affiliates from directly or indirectly soliciting Diligent's merchants or customers or permitting a third party to solicit Diligent's merchants or customers. (*Id.* § 4.1(a).)

Addressing these provisions in the Complaint, Diligent alleges that "iSolutions processes payments via the same upstream vendor as Diligent"—namely, CardConnect—and so, "Carpay's selection of iSolutions constitutes a breach of Carpay's continuing non-solicitation and non-circumvention obligations under Section 4 of the [ICA], as amended." (Compl. ¶ 80.) Diligent further alleges that "Carpay's CEO advised that Carpay plann[ed] to 'break non-solicit,'" that Carpay "also suggested that it might move its business from [Diligent's] platform altogether," and that Carpay's CEO "stated, 'there's ways around [the non-solicit].'" (*Id.* ¶ 65.) These allegations, however, are not sufficient to plausibly allege that Carpay violated the ICA when it replaced Diligent with iSolutions. Nowhere in the Complaint does Diligent allege that Carpay indirectly or directly solicited CardConnect or permitted iSolutions to solicit CardConnect in order for Carpay to enter a direct business arrangement or contract between with CardConnect. Nor does Diligent allege that Carpay indirectly or directly solicited Diligent's merchants or customers, or that Carpay authorized iSolutions to do so.

Finally, Section 1.3 does not restrict Carpay's ability to replace Diligent with a third-party competitor beyond requiring that Carpay give 90 days' written notice of its intent to do so. The Court finds no language in the ICA that forecloses Carpay from replacing Diligent with a third-

party competitor that has a preexisting partnership with CardConnect. Consequently, it would be unreasonable to interpret the ICA, as written, as prohibiting Carpay's alleged conduct.

### C.      Carpay's Revocation of Diligent's License to Sell Software

Diligent also claims that Carpay breached the notice provisions of the ICA when it immediately terminated Diligent's access to Carpay's email system, despite Carpay supposedly having provided advance notice of its intent to replace Diligent and revoke Diligent's license to resell Carpay's software. In essence, Diligent contends that the practical effect of Carpay's actions was the immediate replacement of Diligent and revocation of Diligent's license to sell Carpay's products. In arguing for dismissal, Carpay contends that its email to Diligent fulfilled its notice obligations and the ICA does not require Carpay to provide Diligent with access to its email system or send notice prior to revocation.

As noted above, Section 1.3 of the ICA mandates that Carpay provide Diligent with 90 days' written notice of its intent to replace Diligent with a third-party competitor. (ICA § 1.3.) Further, Section A.1 of the Amended ICA establishes that Carpay must provide Diligent with 60 days' written notice prior to revoking Diligent's license to sell Carpay's software to Wayne Reaves and AutoManager Dealer platforms, and give Diligent 30 days' written notice before resuming direct sales to those platforms. (Ex. A to Notice of Removal at 37–38 ("Am. ICA"), Am. ICA § A.1, Dkt. No. 1-1.)

In its Complaint, Diligent acknowledges that Carpay sent Diligent formal notice of its plans to replace Diligent as its payment processing partner and work with third-party competitors, to revoke Diligent's license to resell its products, and to resume direct sales to Wayne Reaves and AutoManager Dealer platform users. (Compl. ¶¶ 67–68.) Yet it nonetheless goes on to allege that

Carpay violated the advance notice requirements because "Carpay took these actions immediately." (*Id.* ¶ 69.) Diligent expands on this claim in other paragraphs of the Complaint:

> Carpay had provided [Diligent] access to its e-mail system. The relationship between [Diligent] and Carpay was dependent upon [Diligent's] access to Carpay's e-mail system for purposes of dealer subscriptions and fulfillment of the parties' obligations. However, on or about May 7, 2021, Carpay immediately shut down [Diligent's] access to its e-mail system.
>
> As a direct result, [Diligent] was precluded from effectively marketing Carpay's software during the contracted-for sixty-day transition period as provided for under the [ICA].

(*Id.* ¶¶ 70–71.)

As written, the ICA contains no language indicating that Carpay must or will provide Diligent with access to its email system. Significantly, the notice provision governing Diligent's right to sell Carpay's software does not state that Diligent's license includes an ancillary right of access to Carpay's email system. Rather, the sole limitation on Carpay's ability to terminate Diligent's license is that it must give Diligent 60 days' prior written notice. Moreover, the ICA expressly provides that "[e]xcept as required by the Rules, this [ICA] is the entire Agreement between the parties respecting the subject matter hereof and there are no representations, warranties or commitments other than those expressed herein." (ICA § 9.3.) Diligent does not allege, for instance, that Carpay actually revoked its license to sell Carpay's software prior to 60 days, that Carpay actually resumed the direct sales of its software to Wayne Reaves and AutoManager Dealer platforms prior to 30 days, or that Carpay actually replaced Diligent with iSolutions prior to 90 days—it alleges only that Carpay's conduct in terminating Diligent's access to the email system had the practical effect of breaching their agreement. Based on the plain language of the agreement, this alleged conduct did not breach the ICA's advance notice provisions.

### D. Covenant of Good Faith and Fair Dealing

Finally, Diligent asserts that Carpay breached the covenant of good faith and fair dealing "by acting in a way that impaired the benefits [Diligent] has the right to expect under the [ICA], as amended." (Compl. ¶ 92.)

"Every contract contains an implied covenant of good faith and fair dealing*." McCleary v. Wells Fargo Sec., L.L.C.*, 29 N.E.3d 1087, 1093 (Ill. App. Ct. 2015) (citation omitted). Under Illinois law, the implied covenant of good faith and fair dealing is a tool of construction for contracts, not an independent source of obligations. *See Brooklyn Bagel Boys, Inc. v. Earthgrains Refrigerated Dough Prod., Inc*., 212 F.3d 373, 382 (7th Cir. 2000) (finding that the defendant did not breach the duty of good faith and fair dealing because the relevant contract for the provision of goods did not prohibit the defendant from manufacturing its own bagels during the termination period, and the plaintiff failed to adduce sufficient evidence that the defendant manufacturing its own bagels reasonably could not have been contemplated by the parties). The covenant of good faith and fair dealing is designed to "ensure that parties do not take advantage of each other in a way that could not have been contemplated at the time the contract was drafted or do anything that will destroy the other party's right to receive the benefit of the contract." *Eckhardt v. Idea Factory, LLC*, 193 N.E.3d 182, 194 (Ill. App. Ct. 2021) (internal quotation marks and citation omitted). "When the contract is silent, principles of good faith . . . and the reasonable expectations of the trade . . . fill the gap." *Brooklyn Bagel Boys*, 212 F.3d at 382. (citation and internal quotation marks omitted). "Disputes involving the exercise of good faith arise when one party is given broad discretion in performing its obligations under the contract." *McCleary*, 29 N.E.3d at 1093 (citation omitted). For a plaintiff to plead a breach of the covenant of good faith and fair dealing successfully, they must allege the existence of contractual discretion that the

defendant exercised "in a manner contrary to the reasonable expectations of the parties." *Slay v. Allstate Corp.*, 115 N.E.3d 941, 951 (Ill. App. Ct. 2018) (citation and internal quotation marks omitted).

Here, the Court has concluded that Diligent has failed to state a claim that Carpay breached any express provision of the ICA. Among other things, Diligent has failed to plausibly allege that Carpay breached the notice provisions when it allegedly terminated Diligent's access to Carpay's email system immediately after Carpay sent notice of its intent to replace Diligent, revoke its license to sell Carpay's software, and resume direct sales. But the ICA is silent on what happens during the notice period—specifically, whether Carpay is permitted to effectively end its business relationship with Diligent prior to the expiration of the notice period by terminating Diligent's access to its email system.

The Complaint references Section A.1 of the Amended ICA, which states that Diligent has the right to sell Carpay's software and Carpay does not intend to sell its software directly to Wayne Reaves and AutoManager Dealer platforms; however, Carpay may revoke Diligent's right to sell its software to those platforms "at any point and for any reason" by giving Diligent 60 days' notice, and that Carpay may resume direct sales to those platforms "at any point and for any reason" by providing Diligent 30 days' notice. (Am. ICA § A.1.) Drawing reasonable inferences in Diligent's favor, the Court finds that Diligent has plausibly alleged that Section A.1 provided Carpay with the absolute discretion to revoke Diligent's license to sell its software or resume direct sales at any point and for any reason. *Cf. Wilson v. Career Educ. Corp.*, 729 F.3d 665, 674 (7th Cir. 2013) (Darrow, J., concurring) (finding that discretion existed where one party had the discretion to terminate the contract); *Pierce Packaging Co. v. Atlas Copco Wagner, Inc*., No. 03 C 50083, 2003 WL 22287390, at *2 (N.D. Ill. Oct. 2, 2003) (noting that no discretion existed

pursuant to the covenant of good faith and fair dealing where both parties had discretion to terminate the contract).

In addition, Diligent plausibly alleges that Carpay exercised its contractual discretion in a manner contrary to the reasonable expectations of the parties during the termination notice period. While no provision in the ICA or Amended ICA required Carpay to provide Diligent with access to its email system, the parties' relationship depended upon Diligent's email access for purposes of dealer subscriptions and fulfillment of the parties' obligations. (Compl. ¶ 70.) Diligent further asserts that it could not effectively market Carpay's software during the 60-day transition period because Carpay immediately terminated its email access. (*Id.* ¶¶ 70–71.) Together, these allegations are sufficient to state a claim based on the contention that the parties did not reasonably contemplate Carpay's termination of Diligent's email access—access upon which the parties depended for their business relationship—during the termination notice period. *Cf. Arlington Fin. Corp. v. Ben Franklin Bank of Ill.*, No. 98 C 7068, 1999 WL 89567, at *4 (N.D. Ill. Feb. 16, 1999) (concluding that a bank breached the covenant of good faith and fair dealing with respect to a loan purchase agreement when it refused to evaluate loans during the sixty-day termination notice period, despite the bank having discretion to decline to purchase any particular loan); *see also Apex Med. Rsch., AMR, Inc. v. Arif*, 145 F. Supp. 3d 814, 828 (N.D. Ill. 2015) (describing *Arlington* as "finding under Illinois law that the plaintiff had a reasonable expectancy that business relationships would continue for at least sixty days after notification of termination where the loan purchase agreements contained a sixty-day notice period for termination").

Accordingly, Count I survives the motion to dismiss, but only with respect to Diligent's claim that Carpay breached the covenant of good faith and fair dealing with respect to the ICA's and Amended ICA's notice provisions.

## II.     Unjust Enrichment (Count II)

In Count II of the Complaint, Diligent asserts a claim for unjust enrichment "in the alternative to Count I for breach of contract in the event the [C]ourt finds the [ICA] is not fully or partially enforceable." (Compl. ¶ 96.) "To state a claim for unjust enrichment under Illinois law, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that the defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *Gociman v. Loyola Univ. of Chi.*, 41 F.4th 873, 886 (7th Cir. 2022) (citing *Hatcher v. Hatcher*, 158 N.E.3d 326, 330 (Ill. App. Ct. 2020)). Unjust enrichment is not a viable claim where the conduct at issue is the subject of an express contract between the parties. *See Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 615 (7th Cir. 2013) (citations omitted). This rule is rooted in the logic that unjust enrichment provides an equitable remedy resulting from a contract implied in law, and an implied contract cannot exist where an express contract governs the parties' relationship. *Id.* Further, an equitable remedy cannot be available when a legal remedy exists. *Id*. Simply put, parties cannot use quasi-contractual theories to "shift risk[s] that they knowingly assumed" under a contract. *Cromeens, Holloman, Sibert, Inc v. AB Volvo*, 349 F.3d 376, 397 (7th Cir. 2003).

That said, a plaintiff may simultaneously plead the inconsistent theories of breach of contract and unjust enrichment in the following limited circumstances: "(1) there is a contract, and the defendant is liable for breach of it; and (2) if there is not a contract, then the defendant is liable for unjustly enriching himself at the plaintiff's expense." *Gociman*, 41 F.4th at 886–87 (quoting *Mashallah, Inc. v. W. Bend Mut. Ins. Co.*, 20 F.4th 311, 325 (7th Cir. 2021)). In other words, a plaintiff "is entitled to plead unjust enrichment as an alternative to her breach of contract claim." *Terrazzino v. Wal-Mart Stores, Inc.*, 335 F. Supp. 3d 1074, 1087 (N.D. Ill. 2018).

Nonetheless, it is impermissible for a plaintiff to "include allegations of an express contract which governs the relationship of the parties" in its unjust enrichment claim. *Mashallah, Inc.*, 20 F.4th at 325.

Here, the unjust enrichment claim fails because the ICA—an express contract—governs the parties' conduct. Notably, Diligent is not seeking to invalidate the contract. *Cf. Mashallah, Inc.*, 20 F.4th at 325 (discussing *Peddinghaus v. Peddinghaus*, 692 N.E.2d 122 (Ill. App. Ct. 1998), where the plaintiff alleged that the defendant had fraudulently induced him to enter the contract, which the plaintiff sought to rescind). To the contrary, Diligent's unjust enrichment claim depends on the existence of a valid contract. For instance, Diligent asserts that Carpay received its ill-gained benefits by "breaching the provisions of agreements" and "failing to adhere to promises," "circumstances that would make it unjust for [Carpay] to retain such benefits without paying the reasonable value thereof." (Compl. ¶ 102.) Although the Complaint nominally brings a claim for unjust enrichment "in the alternative" to its breach of contract claim, the allegations reveal Diligent's reliance on the existence of a contract between the parties.

Diligent further alleges that Carpay received its ill-gained benefits by "engaging in tortious and wrongful conduct." (*Id.*) Insofar as Diligent bases its claim for unjust enrichment on such conduct, Diligent fails to identify any tort theory on which its claim is based. *Cf. Mashallah, Inc.*, 20 F.4th at 325 (observing that because the plaintiff's unjust enrichment claim in *Peddinghaus* "[was] based on tort, instead of quasi-contract, the existence of a specific contract [did] not defeat his cause of action," and noting that the alleged tort was fraudulent inducement, "[a] successful showing of [which] invalidates a contract" (citation omitted)). As a result, the Court finds that Diligent has failed to plead unjust enrichment successfully as an alternative to its breach-of-contract claim. Accordingly, Count II is dismissed.

### III. Specific Performance (Count III)

Next, in Count III, Diligent purports to assert a claim for specific performance. Specifically, Diligent seeks specific performance of Carpay's non-solicitation and non-circumvention and confidentiality obligations, and an order commanding Carpay to comply with its contractual obligations. (Compl. ¶¶ 105–10.) But "[s]pecific performance is a remedy, not a cause of action." *LaSalle Nat'l Bank v. Metro. Life Ins. Co.*, 18 F.3d 1371, 1376 (7th Cir. 1994). And "courts often interpret a 'claim' for specific performance as a breach of contract claim seeking specific performance." *MiMedx Grp., Inc. v. Fox,* No. 16 CV 11715, 2017 WL 3278913, at *5 (N.D. Ill. Aug. 2, 2017) (citing as an example *JNS Power & Control Sys., Inc. v. 350 Green, LLC*, 624 F. App'x 439, 445 (7th Cir. 2015)). Where, as here, Diligent already asserts a claim for breach of contract, its claim for specific performance is "duplicative" of that claim. *MiMedx Grp.*, 2017 WL 3278913, at *5; *see also Carpenter v. Sirva Relocation, LLC*, 2013 WL 6454253, at *10 (explaining that the plaintiff's claim for specific performance was "redundant of [the plaintiff's] other claims," which included breach of contract).

To the extent Diligent seeks specific performance as a form of equitable relief for its breach of contract claim, Diligent may request such relief, but the Court declines to treat the request as an independent cause of action. *See Lagen v. United Cont'l Holdings, Inc.*, 920 F. Supp. 2d 912, 918–19 (N.D. Ill. 2013) (finding the plaintiff's "request for specific performance as a form of relief permissible," but declining to construe the plaintiff's "purported" claim for specific performance as an "independent cause of action," where the plaintiff also asserted claims for breach of contract, breach of the covenant of good faith and fair dealing, and unjust enrichment). Therefore, Count III is dismissed as well.

## IV.    Declaratory Relief (Count IV)

Lastly, in Count IV, Diligent seeks a declaration that Carpay breached the ISA, Diligent has no resultant duty to pay residuals to Carpay, and Diligent is entitled to recoup the excess amounts of residuals paid to Carpay.

The Declaratory Judgment Act "has long been understood to confer on federal courts 'unique and substantial discretion in deciding whether to declare the rights of litigants.'" *Amling v. Harrow Indus. LLC*, 943 F.3d 373, 379 (7th Cir. 2019) (citation omitted). Courts in this District regularly decline to exercise such discretion if a claim for declaratory judgment substantially overlaps with the same legal issue that will be addressed in the plaintiff's substantive claims. *See, e.g.*, *Harris v. Rust-Oleum Corp.*, No. 21-CV-01376, 2022 WL 952743, at *6 (N.D. Ill. Mar. 30, 2022) ("When the declaration sought by the plaintiff must necessarily be determined to resolve the substantive suit, then the claim 'serve[s] no useful purpose.'"); *Cohn v. Guaranteed Rate Inc.*, 130 F. Supp. 3d 1198, 1205 (N.D. Ill. 2015) (dismissing a declaratory judgment claim as duplicative, where the substantive legal issue was the same as in the breach of contract count); *Village of Sugar Grove v. F.D.I.C.*, 2011 WL 3876935, at *9 (N.D. Ill. 2011). And a court's analysis is unaffected by plaintiffs requesting different forms of relief in their declaratory judgment claims than in their substantive claims, as long as the substantive issues that the court must decide are duplicative. *See Cohn*, 130 F. Supp. 3d at 1206 (collecting cases).

Here, the Court concludes that the request for a declaratory judgment action serves no useful purpose because Diligent must demonstrate that Carpay violated the ICA to prevail on its declaratory judgment claim and substantive breach of contract claim. Count IV is thus dismissed.

## V. Punitive Damages

Although Diligent does not request punitive damages in its formal prayer for relief, one paragraph of the Complaint alleges that "Carpay's bad acts, as detailed herein, were outrageous, undertaken in bad faith, and with the malicious and intentional purpose of harming [Diligent], entitling [Diligent] to an award of punitive damages, in an amount to be determined at trial." (Compl. ¶ 82.) To the extent this constitutes a request for punitive damages, Carpay argues that the request fails as a matter of law.

Indeed, "[w]hether punitive damages can be awarded for a particular cause of action is a question of law." *Am. Transp. Grp., LLC v. Power*, No. 17 C 7962, 2018 WL 1993204, at *6 (N.D. Ill. Apr. 27, 2018) (citing *Medow v. Flavin*, 782 N.E.2d 733, 746 (Ill. App. Ct. 2002)). And "Illinois law does not authorize the award of punitive damages for breach of contract claims." *Kibbons v. Taft Sch. Dist. 90*, 563 F. Supp. 3d 798, 811 (N.D. Ill. 2021) (citing *Cramer v. Ins. Exch. Agency*, 675 N.E.2d 897, 901 (Ill. 1996). Nonetheless, punitive damages are permitted "where the defendant is also found to have committed an independent tort, separate from the breach of contract." *Promier Prods., Inc. v. Orion Cap., LLC*, No. 21 CV 1094, 2024 WL 1158259, at *3 (N.D. Ill. Mar. 18, 2024) (citation omitted). That is, "'the conduct causing the breach'—the breach itself—must also constitute a tort for which punitive damages are recoverable." *Id.* (quoting *Morrow v. L.A. Goldschmidt Assocs., Inc.*, 492 N.E. 2d 181, 184 (Ill. 1986)). Here, however, Carpay has failed to identify an independent tort as the basis for any of its claims. Therefore, an award of punitive damages is inappropriate in this action.

## VI. Diligent's Payments to Carpay

In its prayer for relief, Diligent seeks to "recoup all amounts paid to Carpay in excess of the [r]esiduals due and owing to Carpay as of such date of breach." (Compl. at 19.) That is,

Diligent seeks reimbursement for the payments it made to Carpay after the date of Carpay's alleged breach. Carpay, however, maintains that the voluntary payment doctrine bars Diligent's claims.

"[A] common-law doctrine incorporated into Illinois law," the voluntary payment doctrine provides that "a plaintiff who voluntarily pays money in reply to an incorrect or illegal claim of right cannot recover that payment unless he can show fraud, coercion, or mistake of fact." *Spivery v. Adaptive Mktg. LLC*, 622 F.3d 816, 821 (7th Cir. 2010) (citing *Smith v. Prime Cable of Chi.*, 658 N.E.2d 1325, 1329–30 (Ill. App. Ct. 1995)). The voluntary payment doctrine is an affirmative defense, however, and a complaint need not "plead around an affirmative defense to survive a motion to dismiss." *Pittsfield Dev., LLC v. Travelers Indem. Co.*, 542 F. Supp. 3d 791, 799 (N.D. Ill. 2021) (internal quotation marks omitted). Because the doctrine provides an affirmative defense, the Court finds it premature to consider the argument. *See La. Firefighters' Ret. Sys. v. N. Tr. Invs., N.A.*, No. 09 C 7203, 2015 WL 1281493, at *5 n.3 (N.D. Ill. Mar. 17, 2015) (denying to address the counter-defendant's argument that the voluntary payment doctrine barred the counter-plaintiff's claims "because that doctrine is an affirmative defense and thus not appropriately addressed on a Rule 12(b)(6) motion" (citing *Xechem v. Bristol–Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004) ("Orders under Rule 12(b)(6) are not appropriate responses to the invocation of defenses, for plaintiffs need not anticipate and attempt to plead around all potential defenses."))).

## CONCLUSION

For the foregoing reasons, Carpay's motion to dismiss (Dkt. No. 20) is granted in part and denied in part. The Court grants the motion with respect to Counts II, III, and IV. Those claims are dismissed. The Court denies the motion with respect to Count I, as Diligent has plausibly alleged that Carpay breached the implied covenant of good faith and fair dealing contained in the ICA and Amended ICA.

ENTERED:

Dated:  August 22, 2025

_____
Andrea R. Wood
United States District Judge